# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                  No. CR 15-4268 JB

EUGENE MARTINEZ,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Objections to PSR, filed September 23, 2019 (Doc. 2891)("Objections"). The primary issues are: (i) whether the 2-level adjustment for restraint of victim under § 3A1.3 of the United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)("U.S.S.G." or "Guidelines")[1] applies to Defendant

---

[1]The Supreme Court of the United States of America held in Peugh v. United States, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

569 U.S. at 549 (emphasis in original). The 2018 Guidelines Manual provides, however, that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless doing so "would violate the *ex post facto* clause of the United States Constitution," in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(a)-(b)(1). Defendant Eugene Martinez committed the offense against Rolando Garza on March 26, 2001, see Second Superseding Indictment at 10, filed March 9, 2017 (Doc. 947), so the 1989 Guidelines Manual, effective November 1, 1989, would apply to the offenses if the Court does not use the current Guidelines Manual, see U.S.S.G. § 1B1.11(b)(1). Using the 1989 Guidelines Manual does not change the result here. See U.S.S.G. § 1B1.11(b)(1). Accordingly, the Court uses the 2018 Guidelines Manual.

Eugene Martinez' conviction for Count 2, because Martinez held the legs of the victim, Rolando

Garza, so that Garza could not escape the killing; (ii) whether the 2-level adjustment for vulnerable

victim under U.S.S.G. § 3A1.1(b)(1) applies to Martinez' conviction for Count 2, because SNM

placed a greenlight on Garza and Martinez helped kill Garza in his prison cell; and (iii) whether

the United States Probation Office's determination of a criminal history category of VI in the

Presentencing Investigation Report, filed September 16, 2019 (Doc. 2881)("Second PSR"), should

be reduced to category V, because of irregularities in the Second PSR's criminal history section.

The Court concludes that: (i) Martinez physically restrained Garza, who was killed in a small,

enclosed area, by holding Garza's legs, establishing that he was restrained under U.S.S.G. § 3A1.3

by a preponderance of the evidence, so the Court overrules this Objection; (ii) Garza's status as an

SNM target imprisoned with SNM members, of which Martinez was aware, establishes that Garza

was a vulnerable victim under U.S.S.G. § 3A1.1(b)(1) by a preponderance of the evidence, so the

Court overrules this Objection; and (iii) Martinez's criminal history category should be reduced

from VI to V, because the Second PSR contains several prior convictions that were illegal and

should not count toward Martinez' criminal history score, so the Court sustains this Objection.

Martinez pled guilty to the Second Superseding Indictment Count 2, "Murder of R.G." on

May 5, 2017. Second Superseding Indictment at 10, filed March 9, 2017

(Doc. 949)("Indictment"). See Plea Agreement ¶ 3, at 2, filed May 5, 2017 (Doc. 1138). In his

Plea Agreement, Martinez admits the following facts and declares them true under penalty of

perjury:

> I became a member of the SNM in 1998 in Estancia. The SNM is an
> ongoing criminal organization whose members, prospects and associates engage in
> acts of violence and other criminal activities, including murder, kidnapping,
> attempted murder, and conspiracy to manufacture/distribute narcotics. The SNM
> operates in the District of New Mexico and elsewhere. The SNM constitutes an

enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2000, I was incarcerated in the New Mexico Corrections Department (NMCD) and was transferred to the Southern New Mexico Correctional Facility (SNMCF). In 2001, Billy Garcia, a.k.a. "Wild Bill," arrived at SNMCF, and people began to worry about what might happen next. Shortly after that, Leonard Lujan approached me and advised me to tell two other people in my pod "to handle that."

As a result, I did as I was told, having been a member in the SNM for some time at that point. I knew the SNM was going to take some type of action against the person identified in the indictment as R.G. and that Christopher Chavez volunteered to participate because he already had issues with R.G.

I was ordered to assist in this action against R.G. and aided both Christopher Chavez and Allen Patterson. Among other things, I served as a lookout when Chavez and Patterson entered R.G.'s cell. Patterson slammed R.G. to the ground, and Chavez also jumped on top of him and attempted to strangle him. Chavez and Patterson began to struggle with R.G., so I had to get involved by entering the cell. I ended up holding R.G.'s legs while Chavez held R.G.'s upper body and Patterson strangled R.G. All three of us left the area after R.G. was strangled to death by Patterson.

The murder was carried out as planned at SNMCF on or about March 26, 2001, in Dona Ana County, in the District of New Mexico.

Thus, I was ordered to assist in the murder of R.G. and aided and abetted in the murder, because it was an SNM ordered murder, and because it was expected of me as a member of the SNM gang.

Plea Agreement ¶ 9, at 3-4. The Plea Agreement provides that Martinez "agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level." Plea Agreement ¶ 10, at 4.

The Presentence Investigation Report, filed February 6, 2019 (Doc. 2502)("First PSR"), elaborates on the offense conduct, providing:

22.     On March 26, 2001, officers with the New Mexico State Police (NMSP) Criminal Investigations were advised by officials at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico, that

an inmate was discovered dead in his cell. Just prior to leaving for the facility, officers received additional information that a second inmate was also found dead in his cell. Upon arrival, NMSP investigators were informed the victims, identified as R.G. and F.C., were located in separate pods, but it appeared both had been strangled. Investigators were also notified the two victims were members of the SNM gang.

23.     The NMSP investigator met with the correctional officer (CO) who found victim R.G. The CO stated he began his rounds at 6:00 in the morning, and while checking all of the cells, he noticed R.G. was in his bed. According to the CO, R.G. was covered with a blanket, but the CO admitted he was unable to see R.G.'s head. The CO indicated he was making his rounds again at approximately 8:30 in the morning and entered R.G.'s cell, because he was not responding to the CO's questions. Upon entering the cell, the CO touched R.G.'s shoulder, which was hard. He then exited the cell and immediately contacted a sergeant, a second CO, and the medical unit, all of whom responded to assist.

24.     R.G. was rolled over while in his bed, at which time, investigators observed a shoeprint just under the bed, where R.G.'s head had been lying. Droplets of blood were located near the end of the bed and on the pillow. An interview with one of the registered nurses (RN) revealed she observed R.G. lying face down with his head turned slightly to the left, and the blanket was pulled up to his neck. The RN took the blanket off R.G. and noticed he was wearing his green pants and shoes, which the RN found unusual. She also noticed his hand was cyanotic and blue and had blotching. The RN noted there was no evidence of trauma; however, his eyes were very bloodshot, and the inside of his bottom lip appeared to have been bitten. The inside of his upper lip was dark purple and appeared swollen, and R.G. had possible track marks on the right side of his neck. When R.G. was rolled over onto his side, the nurse observed mottling and blood settling all around his chest area and a 3 to 4-inch spot of dried blood near his lower chest area and upper abdomen. Additionally, injuries to R.G.'s neck were observed, which were consistent with ligature marks. The marks were thin discolored impression areas on the neck and were adjacent to the length of R.G.'s neck and throat area. Based on these injuries, it was believed R.G. may have died as a result of strangulation.

25.     On April 13, 2001, a report of findings was completed by the Office of the Medical Investigator in Albuquerque, New Mexico. R.G. had no defensive wounds nor any additional large and noticeable wounds throughout his body. The wounds on his neck appeared to have been made by a large shoelace or laundry bag cord. The autopsy revealed a ligature strangulation just above the larynx and a posterior fracture of the right aspect of the hyoid bone with surrounding soft tissue hemorrhage. Also noted were blunt force

injuries of the torso and blunt force injuries of extremities, to include a contusion on the medial left arm, a purple contusion on the left groin region, an abrasion on the left elbow, a dried red abrasion on the right mid shin, and a red abrasion on the left knee. The opinion states R.G. died of ligature strangulation. According to the autopsy, there was a linear, horizontal contusion with associated linear abrasions on the neck, consistent with a ligature mark. There was hemorrhage on the neck muscles beneath the ligature mark and a fracture of the neck bone (hyoid bone). There were petechial hemorrhages on the eyes, inner eyelids, and larynx, which are features of strangulation. There were abrasions and contusions on the inner lips, a contusion of the tongue, and contusions on the upper left arm and the left groin. The manner of death was ruled a homicide.

26.     On April 26, 2001, an interview was conducted with inmate J.O., who stated on March 25, 2001, he and inmates Christopher Chavez, **Eugene Martinez**, Allen Paterson, and R.G. were using heroin in Chavez's cell. Chavez and R.G. were arguing over the heroin, as Chavez did not receive his portion. R.G. was identified as the individual who obtained and provided heroin to the inmates in the pod. J.O. stated **Martinez** and Chavez were involved in the murder of R.G. He also noted **Martinez** appeared to be very worried, as he was having nightmares about the incident and believed it was the "spirit of conscience" bothering **Martinez**. J.O. added Chavez had made it known to other inmates that he would "take care" of any inmate who talked about the murder. J.O. noted Chavez was "trying to earn his stripes" in the SNM organization. Finally, J.O. indicated Chavez specifically told him to make sure he went to work the morning of March 26, 2001.

27.     On that same date, officers attempted to conduct an interview with **Martinez** regarding the death of R.G. However, **Martinez** invoked his right to remain silent and declined to answer any questions.

28.     On April 26, 2001, officers were able to interview Christopher Chavez. According to Chavez, he used heroin on the night of March 25, 2001, and fell asleep in his cell at approximately 9:30 that night. During the early morning hours of March 26, 2001, he went to breakfast, then to his work detail, but he noted he did not see R.G. that morning. Shortly after arriving at his work detail, all inmates were escorted to the gym and detained. Chavez denied killing, or knowing who killed, R.G.

29.     On May 3, 2001, officers interviewed inmate R.M., who stated he did not see the person or persons who killed R.G., but he knew Chavez and Patterson were involved. According to R.M., on March 25, 2001, he overheard Chavez and Patterson having a conversation outside of his cell and heard one of them say, "He is already awake." He believed they were talking about him, so he confronted Chavez. Chavez stated it did not

concern R.M. and told him to "stay out of it". R.M. stated he again questioned Chavez, who responded he and Patterson were going to "fuck up Looney (R.G.)". R.M. noted later that evening, he heard a scuffle in one of the cells and heard a door slam. He had previously observed Chavez, Patterson, and **Martinez** enter R.G.'s cell, but he did not see them exit the cell. According to R.M., since the incident occurred, **Martinez** was worried about his DNA being in the cell, as he had cut his hand, and Chavez was telling the other inmates, "Nobody will get caught if nobody breaks." When asked why R.G. was murdered, R.M. stated R.G. "jumped the fence," meaning he became a member of another gang.

30.     On March 6, 2002, a memorandum was submitted the Central New Mexico Correctional Facility Segregation Unit Manager in reference to inmate R.M. Information received prior to this date indicated Billy Garcia instructed R.M. to murder R.G. R.M., in turn, assigned or told inmates Alverado and DeLeon to carry out the hit. The same information noted R.M. was in bad standing with the SNM, as he failed to carry out a hit on inmate M.S.; therefore, R.M. had to "redeem" himself by murdering R.G. Additionally, a confidential informant (CI) identified R.M., **Martinez**, and Patterson as the individuals who killed R.G.

31.     On March 6, 2002, a memorandum was submitted the Central New Mexico Correctional Facility Segregation Unit Manager in reference to inmate Christopher Chavez. Information received prior to this date from a CI identified Chavez as one of the assailants involved in the murder of R.G. No additional information was provided by the CI in reference to Chavez's involvement.

32.     On August 27, 2007, an NMSP officer received authorization to conduct a follow-up interview on the homicide of R.G. On September 11, 2007, the officer was provided with audio recordings, which revealed L.L., an inmate in custody in Albuquerque, New Mexico, had been involved in three homicides. One of the homicides L.L. mentioned occurred at the Metropolitan Detention Center in Albuquerque, while the other two homicides had occurred on March 26, 2001, at the SNMCF.

33.     Prior to September 11, 2007, during the taped interview, L.L. implicated himself as having been given the order to complete the two murders on March 26, 2001. The official order was given to L.L. by B.G., who stated the killings had to be carried out by strangulation and not by a "hot shot," which is a heroin overdose. B.G. also informed L.L. the killings had to be done in the early morning, and both killings had be done at the same time. L.L. stated he chose **Martinez** and told him he wanted "Looney taken out". According to L.L., the order to murder R.G. was initiated, because R.G. had been a one-time member of the Los Carnales gang and was now claiming

membership in the SNM.  L.L. stated he later learned **Martinez** and Christopher Chavez had carried out the order and killed R.G.

34.     Between September 28, 2007, and November 27, 2007, NMSP officers met with Christopher Chavez, **Martinez**, and Allen Patterson.  Each person denied having any knowledge as to who might have killed R.G. in 2001, and no additional information was provided by any of the individuals.

35.     On or about May 18, 2011, an FBI special agent conducted an interview with a confidential human source (CHS) in reference to many outstanding investigations involving members of the SNM.  According to the CHS, R.M. admitted he was in R.G.'s cell with Christopher Chavez, **Martinez**, and Allen Patterson when the murder was committed on March 25, 2001. During their conversations, R.M. informed the CHS that he received the order from B.G. to kill R.G., and Chavez had continually bragged about strangling R.G.

36.     On June 6, 2013, an FBI special agent conducted an interview with a CHS in reference to the murder of R.G.  The CHS stated R.G. was murdered, because he was a validated member of the SNM but was suspected of being, or having been, a Los Carnales rival gang member or associate.

37.     In summary, **Martinez** was one of four individuals who carried out the murder of R.G., which was ordered at the SNMCF on March 26, 2001, by virtue of **Martinez** and the others being members of the SNM. Furthermore, due to the close quarters of R.G.'s cell, which had only one entrance and one exit, R.G. was not able to fight off his assailants or escape while being held down and strangled by multiple individuals.  Moreover, the attacks occurred behind closed doors out of the view of prison guards. Thus, R.G. can be identified as a vulnerable victim in this case.  By virtue of his membership in the SNM, **Martinez** was ordered to participate in the murder by the SNM's leadership.  Therefore, his role in the offense cannot be seen as mitigating.

First PSR ¶¶ 21-37, at 9-12 (bold in original).  The Second PSR includes the same facts as the First

PSR, as well as the following, additional facts:

37.     According to trial testimony provided by **Martinez** in April of 2018, in mid-to-late March of 2001, **Martinez** had a conversation with Leonard Lujan, who instructed him (**Martinez**) to talk to other SNM members in his prison unit.  Lujan told **Martinez** to organize a team of a few people to "handle" R.G., which Martinez described as "basically go in there and handle it, hurt him, kill him" (Page 30 of Martinez transcript).  **Martinez** testified that he did not believe Lujan's request; however, Billy Garcia had recently arrived

at SNMCF and confirmed to **Martinez** that R.G. was to be "handled" the next morning (Page 37 of Martinez transcript).

38.     **Martinez** testified on the morning of March 26, 2001, he continually attempted to avoid getting involved in the murder of R.G. One of the other SNM members, Willie Amador, told **Martinez** "Just be -- just look out. Be right there. Just look out. Make sure. These guys got it." (Page 55 of Martinez transcript). Furthermore, **Martinez** testified that Amador instructed him to be at the door of the cell and, if anything out of control occurred, he was to enter the cell and assist. (Page 58 of Martinez transcript). **Martinez** stated Allen Patterson and Christopher Chavez entered R.G.'s cell first, and he entered "a little later, afterward" (Page 59 of Martinez transcript). **Martinez** testified as to the specific events of the murder of R.G., noting Patterson entered R.G.'s cell, grabbed him and threw him to the ground. **Martinez** stated Christopher Chavez wrapped a laundry bag around R.G.'s neck; however, there was a struggle and **Martinez** indicated he entered the cell and pushed down on R.G.'s legs (Page 61 of the Martinez transcript). Martinez stated after R.G. quit moving, he exited the cell, grabbed his books and school supplies and began heading toward the educational building.

39.     . . . . Furthermore, on May 15, 2019, Judge Browning addressed the Vulnerable Victim enhancement and made a ruling regarding the application of U.S.S.G. §3A1.1(b), *U.S. v. Edward Troup* case. Specifically, the United States Probation Office applied this two-level increase, as it is supported by circuit case law. In U.S. v. Tapia (59 F.3d 1137), the Eleventh Circuit Court found that the victim was "particularly vulnerable by virtue of his incarceration with appellants and his inability to escape, and that the victim was targeted because of this vulnerability." Furthermore, in U.S. v. Lambright (320 F. 3d 517 -- Fifth Circuit) "the District Court based its conclusion that the victim was vulnerable on the findings that he was completely dependent upon the care of the correction officers, that he was locked in his cell prior to the assault, and that he could not protect himself from the assault." The Court found that this increase was appropriate as it was well known that F.C., a member of the SNM gang, had a "green light," which meant he was to be killed. By virtue of his membership in the SNM, **Martinez** was ordered to participate in the murder by the SNM's leadership. Therefore, his role in the offense cannot be seen as mitigating.

Second PSR ¶¶ 37-39, at 12-13 (bold in original). The Court notes that the United States Probation

Office ("USPO"), through its Addendum to the Presentence Report, filed October 8, 2019

(Doc. 2909)("Addendum"), provides additional information gathered through telephone calls with

Martinez' family members about Martinez' relationship with his family members, his childhood and upbringing, his mental and physical condition, and his plans for his life after imprisonment. <u>See</u> Addendum at 3-6.

The USPO applies a base offense level of 43 under U.S.S.G. §§ 2E1.3(a)(2) and 2A1.1(a). <u>See</u> Second PSR ¶ 45, at 15. The USPO applies a 2-level increase for restraint of victim under U.S.S.G. § 3A1.3, <u>see</u> Second PSR ¶ 47, at 15, because "Chavez wrapped a laundry bag around [Garza]'s neck," and because Martinez "entered the cell and pushed down on [Garza]'s legs," Second PSR ¶ 38, at 12-13. The USPO also applies a 2-level increase for attacking a known vulnerable victim under U.S.S.G. § 3A1.1(b)(1), <u>see</u> Second PSR ¶ 48, at 15, because "[Garza] was not able to fight off his assailants or escape while being held down and strangled by multiple individuals," Second PSR ¶ 39, at 13. Furthermore, the USPO calculates Martinez' criminal history score as 13, resulting in criminal history category VI. <u>See</u> Second PSR ¶ 66, at 19. The Guidelines recommend life imprisonment. <u>See</u> Second PSR ¶ 110, at 27.

Martinez raises several factual objections. First, Martinez objects to the Second PSR's paragraph 40, which states that the "Defendant's Admission of Facts contained in the plea agreement will serve as the defendant's version of the offense." Second PSR ¶ 40, at 13. <u>See</u> Objections ¶ 1, at 1. According to Martinez, his "version of the offense would include ¶ 9 of the plea agreement, the attached excerpt from the plea hearing, and his trial testimony." Objections ¶ 1, at 1. <u>See</u> Excerpt from Plea Hearing, filed September 23, 2019 (Doc. 2891-1). The USPO responds that Martinez attached his plea hearing excerpt and that, therefore, "this objection has been resolved." Addendum at 1. The United States agrees with the USPO. <u>See</u> United States' Response to Defendant Eugene Martinez's Objections to the Presentence Investigation Report (Doc. 2891) at 1, filed October 14, 2019 (Doc. 2925)("Objections Response")("This objection

appears to have been resolved . . . ."). Martinez also objects to the Second PSR's paragraph 42, which, he argues, "incorrectly uses the factual basis in the plea agreement as Martinez' Acceptance Statement." Objections ¶ 2, at 1. According to Martinez, an attachment to the Second PSR contains his correct Acceptance Statement, which he had sent informally to the USPO, but paragraph 42 leaves the incorrect factual basis as his Acceptance Statement. See Objections ¶ 2, at 1; Second PSR ¶ 42, at 13-14; Acceptance Statement at 1-6, filed September 16, 2019 (Doc. 2881-3). Martinez acknowledges that the Court will read his statement, and he notes that "this is the one document that a defendant writes specifically for the Court, and as such should properly be in the PSR in ¶ 42, rather than the factual basis that serves an entirely different purpose." Objections ¶ 2, at 2. While the USPO "maintains the information in paragraph 42 is accurate," the USPO also concedes that, "[b]y way of this addendum[,] the acceptance of responsibility statement attached to the redisclosed presentence report is utilized as the defendant's actual acceptance of responsibility statement." Addendum at 1. The United States agrees. See Objections Response at 1 ("This objection appears to have been resolved as indicated in the Addendum.").

Martinez also objects to the lack of personal and family background in the Second PSR's paragraph 85. See Objections ¶ 7, at 8. Martinez notes that a probation officer "spoke at length" with his mother, uncle, and wife, and he requests that the USPO incorporate into the PSR any additional relevant information about his background. Objections ¶ 7, at 8. The USPO responds that it contacted Martinez' family members and that it includes a summary of its interviews with each person in the Addendum. See Addendum at 3-6. See also Objections Response at 3 ("The objection has been addressed by the additional information contained in the Addendum."). Martinez also objects to incorrect statements about his mental and emotional health in the Second

PSR's paragraphs 95 through 98, 130, and 132. See Objections ¶ 8, at 8-9. Martinez requests that information concerning his mental health and competency be added to the PSR, and he further notes that "[t]he Court, having presided over the entire competency process[,] is well aware of Martinez' mental health issues." Objections ¶ 8, at 9. The USPO responds that the mental health information in the Second PSR is "accurate based on all received documentation." Addendum at 3. The USPO maintains that it "informed the defendant and defense counsel [that] this information would be more suited for a Sentencing Memorandum on the defendant's behalf; however, defense counsel adamantly insists the documentation be attached and interpreted in such a way that a variance be recommended." Addendum at 3. The USPO attaches Martinez' requested medical history information to the Addendum. See Competency Evaluation, Communication Evaluation, and Medications at 1-25 (dated Mar. 7, 2014), filed October 8, 2019 (Doc. 2909-1). The USPO argues, however, that "a variance is not permissible as the defendant's count of conviction requires a mandatory term of life imprisonment without release." Addendum at 3. The United States does not address this objection. See Objections Response at 1-6.

Martinez next objects to the restraint-of-victim adjustment in the Second PSR's paragraph 47. See Objections ¶ 4, at 4-5. Martinez maintains that he was "initially not part of the attack on [Garza]," because the attack "was in progress when Martinez went into [Garza]'s cell and held his legs, as he had been instructed to help by Willie Amador." Objections ¶ 4, at 4. Martinez attaches law enforcement notes based on a guard's observations, see Officer Notes, filed September 23, 2019 (Doc. 2891-2), which Martinez argues support his testimony that "he was [] acting as a lookout" at the time of the murder, and thus less involved in the murder than were other defendants, Objections ¶ 4, at 4. The USPO responds by reiterating that, "due to the close quarters of [Garza]'s cell, which had only one entrance and one exit, [Garza] was not able to fight off his

assailants or escape while being held down and strangled by multiple individuals."  Addendum at 1-2.  The USPO states that, because Garza "was restrained in his cell," the restraint-of-victim adjustment applies and that the PSR will remain unchanged.  Addendum at 2.  The United States agrees with the USPO, and it states that Martinez served as a lookout while Defendants Allen Patterson and Christopher Chavez threw Garza to the ground, and tied a laundry bag around his neck.  See Objections Response at 2.  Moreover, the United States explains that, because Martinez entered the cell and "push[ed] down on [Garza]'s legs" when Garza struggled to escape, Martinez was "involved in restraining the victim and was probably the reason the endeavor succeeded."  Objections Response at 2.

U.S.S.G. § 3A1.3 applies where the "victim was physically restrained in the course of the offense."  U.S.S.G. § 3A1.3.  The Guidelines counsel that the restraint-of-victim enhancement does not apply "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself."  U.S.S.G. § 3A1.3 Application Note 2.  The Guidelines define the term "physically restrained" as "the forcible restraint of the victim such as being tied, bound, or locked up."  U.S.S.G. § 1B1.1 Application Note 1(L).  These examples "are merely illustrative and not exhaustive."  United States v. Rodella, No. CR 14-2783, 2015 WL 711941, at *27 (D.N.M. Feb. 5, 2015)(Browning, J.)(citing United States v. Checora, 175 F.3d 782, 790 (10th Cir. 1999)).  The United States Court of Appeals for the Tenth Circuit has advised that the restraint-of-victim enhancement applies where "there [is] a forcible restraint of a victim which occurs during commission of the offense."  United States v. Checora, 175 F.3d at 790 (footnote omitted)(emphasis added).

The Court concludes that, apart from the restraint inherent in murder, the trial testimony establishes by a preponderance of the evidence that Garza was physically restrained in the course

of his murder. See United States v. Baumann, 60 F. App'x 63, 64 (9th Cir. 2003)(unpublished)(upholding district court's application of the § 3A1.3 enhancement, because of the defendant's "forcible confinement of [the victim] to the bathroom and his pinning her to the bathroom floor in a manner that prevented her escape"). Martinez argues that he was less involved in Garza's murder than were the other Defendants, because his primary role was to serve as a "lookout." Objections ¶ 4, at 4. Martinez argues that he did not enter Garza's cell and "hold his legs until after the murder was in progress" -- that is, "during the murder." Objections ¶ 4, at 5.

Martinez relies on United States v. Checora, which he cites as support for the proposition that acts that take place during the commission of a homicide cannot constitute the basis for applying the physical-restraint adjustment. See Objections ¶ 4, at 4-5. In United States v. Checora, the Tenth Circuit stated that "the proper issue before us is whether the chasing and tackling of [the victim] to prevent his escape constitutes 'forcible restraint,' within the meaning of the Guidelines." United States v. Checora, 175 F.3d 782, 790 (10th Cir. 1999)(quoting U.S.S.G. § 1B1.1 Application Note 1(L)). The Tenth Circuit distinguished a case in which the United States Court of Appeals for the Fourth Circuit held that "no physical restraint occurred within the meaning of the Guidelines because the brief holding *during* the stabbing was already an element of the crime of homicide." United States v. Checora, 175 F.3d at 791-92 (citing United States v. Mikalajunas, 936 F.2d 153 (4th Cir. 1991))(emphasis in original). Martinez notes that the Fourth Circuit "'did not purport to address whether the acts of chasing down and catching the victim could constitute restraint,'" and that, because of this distinction, the Court should conclude that holding Garza's legs during the commission of the murder is not a physical restraint. Objections ¶ 4, at 5 (quoting United States v. Checora, 175 F.3d at 792).

The Tenth Circuit rejected the Fourth Circuit's reasoning, and it reasoned that actions that "occurred in this case [are] not a necessary element of the crime of voluntary manslaughter," and thus constitute physical restraint. United States v. Checora, 175 F.3d at 792. The Tenth Circuit held that two of the defendants physically restrained the victim "when they chased and tackled him to the ground to prevent his escape," and that the other two defendants, who helped beat the victim, were also "accountable for this restraint under the relevant conduct provisions" of U.S.S.G. § 1B1.3. United States v. Checora, 175 F.3d at 790. Moreover, the Tenth Circuit concluded that the physical-restraint adjustment applied, because the defendants "used physical force to stop [the victim] from escaping and thus forcibly denied him freedom of movement." 175 F.3d at 791.

The physical-restraint adjustment applies in this case, because Martinez "held [Garza's] legs" to facilitate the murder. Objections ¶ 4, at 4. U.S.S.G. § 3A1.3 states in full: "If a victim was physically restrained in the course of the offense, increase by **2** levels." U.S.S.G. § 3A1.3 (bold in original). Accordingly, all that is required for the application of this enhancement is that Garza was "physically restrained in the course of" his murder. U.S.S.G. § 3A1.3. That Martinez helped physically restrain Garza during the murder does not prevent the adjustment from applying. The Tenth Circuit noted in United States v. Checora that the "guideline and commentary require that there be a forcible restraint of a victim which occurs during commission of the offense." United States v. Checora, 175 F.3d at 790 (emphasis added). Murder can be committed in a number of ways, and thus holding down the legs of a victim so that he cannot escape is not a necessary element of the crime. The Tenth Circuit reasoned that, because the "restraint of [the victim] to prevent his escape added to the offense, it facilitated its commission." United States v. Checora, 175 F.3d at 792. Martinez admits that he "held [Garza's] legs," Objections ¶ 4, at 4; this action helped prevent Garza from escaping and thus "facilitated" the murder, United States v.

Checora, 175 F.3d at 792.  Furthermore, Martinez' actions "denied [Garza] freedom of movement."  United States v. Checora, 175 F.3d at 791.  Indeed, as the United States notes, Martinez' conduct "was probably the reason the endeavor succeeded."  Objections Response at 2. The Court concludes, therefore, that the physical-restraint adjustment applies.

Next, Martinez objects to the vulnerable-victim adjustment in the Second PSR's paragraph 48.  See Objections ¶ 3, at 2-4.  Martinez argues that Garza "was not targeted because of some characteristic that made him particularly vulnerable."  Objections ¶ 3, at 3.  Martinez contends that, although Garza was incarcerated and "might be more vulnerable because of the characteristics of prison life," being an incarcerated inmate alone is "insufficient" to warrant the vulnerable-victim adjustment.  Objections ¶ 3, at 4.  The USPO counters that the vulnerable-victim adjustment applies, because Garza was incarcerated, and was attacked and killed "behind closed doors out of the view of prison guards."  Addendum at 2.  The United States agrees with the USPO, and the United States notes that the circumstances surrounding Garza's murder are similar to the circumstances surrounding Frank Castillo's murder.  See Objections Response at 2.  The United States notes that, like Castillo, Garza was an SNM member with a "greenlight" placed on him, meaning SNM intended to kill him.  Objections Response at 2.  The United States further explains that Martinez' conduct was similar to that of Edward Troup, whom this Court sentenced with a vulnerable-victim adjustment for Castillo's murder.  See Objections Response at 2 (citing United States v. Troup, 2019 WL 4891122, *40 (D.N.M. Oct. 3, 2019)(Browning, J.).  In particular, the United States notes that, just as Martinez served as a lookout during Garza's murder, Troup "'acted as a lookout to prevent others from interfering with [Castillo's] murder.'"  Objections Response at 2 (quoting United States v. Troup, 2019 WL 4891122 at *41).

The 2-level enhancement for a vulnerable victim applies where the victim of the offense of conviction "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," and "the defendant knows or should have known of the victim's unusual vulnerability." U.S.S.G. § 3A1.1 Application Note 2. The Tenth Circuit has explained that the adjustment should apply where "the victim is *unusually* vulnerable or *particularly susceptible* to the crime committed," and where the victims "are unable to protect themselves [and] therefore require greater societal protection." United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002)(emphasis in original). The Tenth Circuit requires the sentencing court to "make an individualized determination; it is not enough that a victim belongs to a class generally considered vulnerable." United States v. Scott, 529 F.3d 1290, 1300-01 (10th Cir. 2008)(citing United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002); United States v. Hardesty, 105 F.3d 558, 560 (10th Cir. 1997)). Further, in addition to the "particularized evidence of a victim's vulnerability, . . . the evidence must also distinguish the victim as atypical of the usual targets of the relevant criminal conduct." United states v. Caballero, 177 F.3d 1235, 1251 (10th Cir. 2002)(citing United States v. Creech, 913 F.2d 780, 782 (10th Cir. 1990)).

In United States v. Tapia, 59 F.3d 1137 (11th Cir. 1995), the United States Court of Appeals for the Eleventh Circuit reviewed the district court's decision that an incarcerated government informant, whom other prisoners assaulted, was a vulnerable victim for U.S.S.G. § 3A1.1's purposes. See United States v. Tapia, 59 F.3d at 1143. The Eleventh Circuit concluded that there was no error in the application of the enhancement to the appellants' convictions under 18 U.S.C. § 1513 (retaliating against a witness, victim, or informant), determining that the district court "correctly concluded that [the victim], as an individual, was particularly vulnerable by virtue of his incarceration with Appellants and his inability to escape, and that [the victim] was targeted

because of this vulnerability." United States v. Tapia, 59 F.3d at 1143. In United States v. Lambright, 320 F.3d 517 (11th Cir. 2003), the United States Court of Appeals for the Fifth Circuit upheld a U.S.S.G. § 3A1.1 enhancement where a corrections officer killed an inmate. See United States v. Lambright, 320 F.3d at 518. The district court concluded that the inmate was a vulnerable victim, because "he was completely dependent upon the care of the correction officers, . . . was locked in his cell prior to the assault, and . . . he could not protect himself from the assault." United States v. Lambright, 320 F.3d at 518.

Trial testimony establishes by a preponderance of the evidence that the SNM targeted Garza for his cooperation with law enforcement. See Excerpt of Testimony of Eugene Martinez at 322:17-25 (taken April 25-26, 2018)(Cooper, Martinez), filed May 23, 2018 (Doc. 2304)("Martinez Tr."). Martinez testified that there had been a greenlight placed on Garza for "a long time." Martinez Tr. at 322:17-20 (Cooper, Martinez). The SNM prohibits snitching and issues greenlights, requiring death, on those who break that rule. See Transcript of Excerpt of Testimony of Leonard Lujan at 12:16-23 (taken April 23-24, 2018)(Beck, Lujan), filed May 16, 2018 (Doc. 2282)("Lujan Tr.")(stating that "the biggest" rule of the SNM is "don't snitch" and that those who do are "going to get hit"); id. at 73:10-12 (Beck, Lujan)(stating that being a rat gets "an automatic green light"); Transcript of Excerpt of Testimony of Manuel Jacob Armijo at 178:2-3 (taken April 26-27, 2018)(Sindel, Armijo), filed May 16, 2018 (Doc. 2284)("Armijo Tr.")(stating that those who talk to the police can get hit). Garza's greenlight made him particularly vulnerable to being murdered, because, if he survived, SNM would kill those responsible. See Lujan Tr. at 415:22-24 (Lujan)("If you didn't do it [(follow orders)], then you were going to be the one greenlighted."); Armijo Tr. at 184:12-16 (Sindel, Armijo)(stating that it is SNM's rule to kill informants and that those who do not kill informants are subject to a hit).

Furthermore, Garza was particularly vulnerable because of his incarceration with other SNM members who knew of the greenlight, were ordered to act on it, and had easy access to act on it. Martinez targeted Garza, because he was ordered to do so, and because of the threat to their own lives if they did not follow through with it. See Lujan Tr. at 87:9-90:19 (Beck, Lujan). In addition, Martinez had easy access to Garza, because they were both housed in the same pod. See Lujan Tr. at 26:19-25 (Beck, Lujan). Martinez assisted in Garza's murder in Garza's cell, by serving as a lookout and later holding down Garza's legs so that Garza could not escape. See Martinez Tr. at 60:8-63:10 (Castellano, Martinez). Accordingly, the Court determines by a preponderance of the evidence that Garza was vulnerable, because of the SNM's hit on him, his incarceration with other SNM members who were ordered to act on the hit, and his limited ability to defend himself or escape from the attack in his cell.

Martinez also objects to the Second PSR's calculation of his criminal history score and category. See Objections ¶¶ 5-6, at 5-8. He first objects to the Second PSR's paragraphs 58 and 59, which Martinez states are "two counts of armed robbery that occurred on the same date, July 30, 1994, with no intervening arrest." Objections ¶ 5, at 5. Martinez states that he was sentenced as a juvenile as to the first count; he asserts, however, that, as to the second count, the court gave him an "illegal sentence," because the court took under advisement the issue whether Martinez was amenable to treatment as a juvenile, which Martinez argues was beyond the court's authority and contradicted the court's sentence as to the first count. Objections ¶ 5, at 5-6. See id. ¶ 5, at 6 ("[T]he district court did not have authority to hold the amenability issue in abeyance."). Accordingly, Martinez requests that the counts in the Second PSR's paragraphs 58 and 59 be treated as one juvenile sentence and that no criminal history points be assigned. See Objections ¶ 5, at 5. The USPO counters that the "criminal history points were accurately assessed," and that

Martinez' argument revolves around "a legal issue, not a guideline issue; therefore, the presentence report shall remain unchanged at this time." Addendum at 2. The United States agrees with the USPO. See Objections Response at 3.

Second, Martinez objects to the Second PSR's paragraph 60, which he contends contains an incorrect arrest date and refers to another "illegal sentence." Objections ¶ 6, at 7. According to Martinez, he was arrested for aggravated burglary as a juvenile and waived his amenability hearing; however, Martinez asserts that the Supreme Court of New Mexico has since ruled that amenability hearings cannot be waived. See Objections ¶ 6, at 7 (citing State v. Jones, 2010-NMSC-012, ¶ 38, 229 P.3d 474, 483-84, 148 N.M. 1, 11-12 (2010)). Martinez maintains that he should not be assigned criminal history points for a conviction that would be "illegal" today. Objections ¶ 6, at 7. Martinez further notes that, because he was sentenced as an adult, he was imprisoned at Bernalillo County Detention Center, where he was "easily recruited by the SNM," because of his small size, young age, and personal background. Objections ¶ 6, at 8. The USPO concedes that the date of Martinez' arrest is incorrect and should be changed to March 17, 1996, but the USPO maintains that Martinez' criminal history points calculation is "accurate" and that Martinez raises a "legal issue, not a guideline issue; therefore, th[e] criminal history points applied in paragraph 60 of the presentence report shall remain unchanged at this time." Addendum at 2. The United States agrees with the USPO. See Objections Response at 3.

While the United States generally agrees with the USPO's calculation of Martinez' criminal history points, the United States submits that it "also agrees with the defendant that there are irregularities with the defendant's convictions in paragraphs 58, 59, and 60 of the PSR." Objections Response at 3. The United States contends that it "does not object to the Court finding the defendant's criminal history is over-represented" because of these irregularities. Objections

Response at 4.  Accordingly, the United States does not object to the Court sentencing Martinez in accordance with criminal history category V, rather than in accordance with category VI.  See Objections Response at 5.

In Custis v. United States, 511 U.S. 485 (1994), the Supreme Court of the United States of America held that, for purposes of the penalty enhancements for prior convictions which are imposed by the Armed Career Criminal Act of 1984, 18 U.S.C. § 924(e), a defendant in a federal sentencing proceeding has no right to collaterally attack the validity of his previous state convictions, with the sole exception of convictions obtained in violation of the right to counsel. See Custis v. United States, 511 U.S. at 487.  In United States v. Garcia, 42 F.3d 573 (10th Cir. 1994), the Tenth Circuit, relying on the Supreme Court of the United States' holding in Custis v. United States, held that, in a sentencing proceeding under the Guidelines, a defendant may not collaterally attack a prior conviction except on the ground of a complete denial of counsel. See United States v. Garcia, 42 F.3d at 581.  The Tenth Circuit has since consistently held that, with the exception of a collateral attack based on complete denial of counsel, a district court cannot consider a collateral attack on a prior conviction when sentencing a defendant.  See United States v. Cousins, 455 F.3d 1116, 1125 (10th Cir. 2006)(stating that "an exception to this general rule [barring collateral attacks of prior convictions] at sentencing is that challenges to the constitutionality of a conviction based upon a violation of the right to counsel are permitted in sentencing proceedings, even though the defendant is attacking the prior state conviction collaterally in federal court"); United States v. Delacruz-Soto, 414 F.3d 1158, 1167 (10th Cir. 2005)(holding that, "with the exception of a collateral attack based on the complete denial of counsel, a district court sentencing a defendant under 8 U.S.C. § 1326(b)(2) and U.S.S.G.

§ 2L1.2(b)(1)(A) cannot consider a collateral attack on a prior conviction"); United States v. Cruz-Alcala, 338 F.3d at 1197 (10th Cir. 2003)(stating the holding of United States v. Garcia).

New Mexico courts have held that amenability hearings must occur before sentencing a youthful offender as a child or an adult, see State v. Ira, 2002-NMCA-037, ¶ 30, 132 N.M. 8, 18-19, 43 P.3d 359, 369-370 (2002), and that amenability hearings are mandatory and thus not waivable, see State v. Jones, 2010-NMSC-012, ¶ 38, 229 P.3d 474, 483-84, 148 N.M. 1, 11-12 (2010).  Under the New Mexico Children's Code, the "court has the discretion to invoke either an adult sentence or juvenile sanctions on a youthful offender."  N.M. Stat. Ann. § 32A-2-20(A).  In making this determination, courts "shall make . . . findings" whether the child is "amenable to treatment or rehabilitation as a child in available facilities," and whether the child is "eligible for commitment to an institution for children with developmental disabilities or mental disorders." N.M. Stat. Ann. § 32A-2-20(B)(1)-(2).  If a youthful offender is sentenced as a child, he "may be subject to extended commitment in the care of the department until the age of twenty-one."  N.M. Stat. Ann. § 32A-2-20(F).

In State v. Ira, the Court of Appeals of New Mexico observed the "dilemma" that New Mexico courts face when they determine whether a youthful offender would be amenable to rehabilitation as a child based on limited information.  State v. Ira, 2002-NMCA-037, ¶ 11, 132 N.M. at 13, 43 P.3d at 363.  The court noted that, while some states "have enacted blended sentencing alternatives that [] give the sentencing judge the option of pursuing a juvenile, rehabilitative approach in marginal cases without sacrificing the ability to impose a long-term, adult incarceration if rehabilitation attempts prove futile," New Mexico law is not so "flexible." 2002-NMCA-037, ¶ 29, 132 N.M. at 18, 43 P.3d at 369.  In his concurrence, the Honorable Richard Bosson, Chief Judge of the Court of Appeals of New Mexico, criticized the pitfalls of deciding ex

ante whether a child is amenable to rehabilitation without being able to revise that decision at a later date:

> We demand that judges determine, <u>now</u>, whether a child is "amenable to treatment or rehabilitation as a child in available facilities," pursuant to NMSA 1978, Section 32A-2-20(B)(1) (1996). We do not, however, afford judges the opportunity to experiment, under controlled conditions, to see how a child actually responds to treatment. Thus, the amenability determination is fraught with risk and, as a practical matter, forces judges to err on the side of caution in making amenability decisions. A lot rides on the wisdom of these amenability decisions.
>
> . . . .
>
> The [New Mexico] Children's Code, unlike adult sentencing codes, requires us <u>first</u> to consider whether the defendant is amenable to rehabilitation . . . . Before requiring judges to make a decision of such consequence, we owe it to the court, to the victim, to the juvenile, and to society as a whole, to inform these decisions as much as practicable. Conditional sentencing, subject to later review, would make those decisions infinitely more informed than our present system.

State v. Ira, 2002-NMCA-037, ¶¶ 51-54, 132 N.M. at 23-24, 43 P.3d at 374-75 (Bosson, C.J., concurring)(emphasis added).

In addition, the Supreme Court of New Mexico has held that amenability hearings are mandatory -- a court cannot "sentence a child as an adult without first making its own determination on the question of amenability to treatment." State v. Jones, 2010-NMSC-012, ¶ 40, 229 P.3d at 483, 148 N.M. at 11. Accordingly, the "amenability determination is not like certain rights which can be waived." State v. Jones, 2010-NMSC-012, ¶ 46, 229 P.3d at 485, 148 N.M. at 12. The Supreme Court of New Mexico noted, however, that its holding announced a "new rule," and the Supreme Court of New Mexico concluded that the new rule did not apply "retroactively." State v. Jones, 2010-NMSC-012, ¶ 47, 229 P.3d at 486, 148 N.M. at 13.

Martinez requests that the Court depart downward from the Second PSR's calculation of his criminal history score and sentence him in accordance with criminal history category V, not

category VI. Martinez does not collaterally attack his prior convictions in the Second PSR's paragraphs 59 and 60, because he does not challenge that his convictions were proper; nor does Martinez argue that the USPO erroneously assigned him points for these convictions under the Guidelines. Rather, Martinez contends that the criminal history points assigned for these convictions in the Second PSR overrepresent his criminal history, because these convictions resulted in "illegal sentences." Objections ¶¶ 5-6, at 5-7. Under New Mexico law, an illegal sentence is any "sentence that is not authorized" by law. State v. Harris, 1984-NMCA-003, ¶ 7, 677 P.2d 625, 627-28, 101 N.M. 12, 14-15 (1984). Moreover, the Tenth Circuit has "defined an 'illegal sentence' as one which is ambiguous with respect to the time and manner in which it is to be served, is internally contradictory, omits a term required to be imposed by statute, is uncertain as to the substance of the sentence, or is a sentence which the judgment of conviction did not authorize." United States v. Dougherty, 106 F.3d 1514, 1515 (10th Cir. 1997)(internal quotations omitted).

The Second PSR's paragraph 59 refers to an illegal sentence, because the sentence was internally contradictory and the court was not authorized to sentence Martinez without first conducting an amenability hearing. The Second PSR's paragraphs 58 and 59 each refer to two counts of armed robbery for offenses that occurred on the same day with no intervening arrest. See Second PSR ¶¶ 58-59, at 16-17; Objections ¶ 5, at 5. On August 4, 1995, a New Mexico court concluded that Martinez -- who was fifteen years old at the time of his offense -- was amenable to rehabilitation as to one count of armed robbery, but the court decided that that the "amenability portion" of the second count of armed robbery "remains under advisement." Judgment and Disposition, filed September 23, 2019 (Doc. 2891-6). Martinez was later sentenced for this second count. See Second PSR ¶ 59, at 17. This sentence was illegal, because the decision to delay an

amenability hearing to determine whether Martinez was amenable to treatment as to count 2 contradicted the simultaneous decision that Martinez was amenable to treatment as to count 1, which involved the same crime on the same day as count 2. Moreover, under New Mexico law, a court may not sentence a youthful offender as a child or an adult without first conducting an amenability hearing, see State v. Ira, 2002-NMCA-037, ¶ 30, 132 N.M. at 18-19, 43 P.3d at 369-70, and the court may not delay the amenability hearing through the use of conditional sentencing, see State v. Jones, 2002-NMCA-037, ¶ 54, 132 N.M. at 24, 43 P.3d at 375 (Bosson, C.J., concurring)("We do not, however, afford judges the opportunity to experiment, under controlled conditions, to see how a child actually responds to treatment."). Martinez did not receive his mandatory amenability hearing after his conviction, and the sentencing court exceeded its statutory authority when it took the amenability determination under advisement and subsequently sentenced Martinez as an adult without first conducting an amenability hearing.

The Second PSR's paragraph 60 also refers to an illegal sentence. The Second PSR's paragraph 60 refers to a count of aggravated burglary with a deadly weapon. See Second PSR ¶ 60, at 17. On February 7, 1997, a New Mexico court sentenced Martinez to nine years imprisonment after concluding that both the State of New Mexico and Martinez agreed to waive Martinez' amenability hearing. See Plea and Disposition, filed September 23, 2019 (Doc. 2891-7). This sentence is illegal, because Martinez and the state government agreed that he was "not amenable to rehabilitation as a juvenile," and Martinez thus received no amenability hearing. Plea and Disposition at 1. Because "parties lack the ability to bargain away the court's own responsibility" to hold an amenability hearing, State v. Jones, 2010-NMSC-012, ¶ 48, 229 P.3d at 486, 148 N.M. at 13, the court's sentence without holding such a hearing would run afoul of New Mexico law today.

Having concluded that the sentences in the Second PSR's paragraphs 59 and 60 contravene current New Mexico law, the Court must next determine whether to grant a downward departure from the Second PSR's calculation of Martinez' criminal history category. The Guidelines provide that downward departures based on the inadequacy of a defendant's criminal history category are warranted if "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1).

> In deciding whether to depart under section 4A1.3, the district court must specifically address the adequacy of a defendant's criminal history category as it reflects both the defendant's past criminal conduct and likely criminal future. The purpose of section 4A1.3 is to allow a district court to deviate from the otherwise applicable guideline range where a defendant's criminal history, likelihood of recidivism, or both differ significantly from the typical offender for whom the applicable criminal history category was formulated. In other words, a district court may depart when a defendant's criminal past or likely criminal future removes the defendant from the heartland of the applicable criminal history category.

United States v. Collins, 122 F.3d 1297, 1304 (10th Cir. 1997), superseded by statute as stated in United States v. Jones, 332 F .3d 1294, 1299 (10th Cir. 2003).

In calculating Martinez' criminal history category, the USPO assigned 1 point for the count in the Second PSR's paragraph 59 and 3 points for the count in paragraph 60. See Second PSR ¶¶ 59-60, at 17. The United States asserts, however, that it has no objection to the Court sentencing Martinez consistent with criminal history category V. See Objections Response at 4. As to Martinez' argument that the sentence in paragraph 59 should not count because it was an illegal sentence, the United States posits that, "[h]ad the sentencing judge properly found the defendant amenable to treatment and a delinquent child in need of rehabilitation in both counts of his armed robbery case, . . . he may have received fewer criminal history points and been sentenced as a juvenile rather than [as] an adult." Objections Response at 4-5. Moreover, as to the sentence in

paragraph 60, Martinez argues that, because he was not afforded an amenability hearing, this sentence would be "illegal" if it were imposed today, and, consequently, his sentence should be treated as a juvenile disposition for the purposes of determining his criminal history category. Objections ¶ 6, at 7. The United States reiterates its position that it does not object to the Court sentencing Martinez consistent with criminal history category V rather than consistent with category VI. See Objections Response at 3-5.

The Court concludes that Martinez' criminal history score should be reduced from 13 points to 11 points, resulting in a sentencing in accordance with criminal history category V. While the Guideline sentence is advisory, the sentencing court must accurately determine the criminal history score and category under the Guidelines. In calculating a defendant's criminal history score, the Guidelines instruct:

> (1)    If the defendant was convicted as an adult and received a sentence of imprisonment exceeding one year and one month, add **3** points under § 4A1.1(a) for each such sentence.
>
> (2)    In any other case,
>
>> (A)    add **2** points under § 4A1.1(b) for each adult or juvenile sentence to confinement of at least sixty days if the defendants was released from such confinement within five years of his commencement of the instant offense;
>>
>> (B)    add **1** point under § 4A1.1(c) for each adult or juvenile sentence imposed within five years of the defendant's commencement of the instant offense not covered in (A).

U.S.S.G. § 4A1.2 (bold in original). As to the count in the Second PSR's paragraph 59, if Martinez had received his amenability hearing and a juvenile sentence, he would have received no criminal history points for the prior conviction, rather than 1 point, because his sentence would have been combined with the sentence in the PSR's paragraph 58, which was imposed more than five years

before the commencement of the offense.  As to the count in the Second PSR's paragraph 60, if Martinez had received his amenability hearing and a juvenile sentence, he would have received 1 or 2 points for the prior conviction, depending on the length of the sentence, rather than 3 points, for the prior conviction.  As a result, Martinez should have a criminal history score of 10 or 11 points and be sentenced in accordance with criminal history category V.  Even though the Guidelines range for this criminal history category may overlap with category VI's range, the Tenth Circuit has held that the "fact that guideline ranges overlap does not make a plain error harmless."  United States v. Osuna, 189 F.3d 1289, 1295 (10th Cir. 1999).  Because the Court determines that this criminal history score more adequately represents Martinez' criminal history than the Second PSR's score, the Court adjusts the Second PSR's calculation of criminal history category VI to category V.

Last, the United States requests that the Court depart downward below the Guidelines' sentencing range, because Martinez has provided "substantial assistance in the prosecution of other defendants in this case and in a separate case."  Sealed Motion for Downward Departure, ¶ 1, at 1, filed October 9, 2019 (Doc. 2915)("United States' Motion").  The United States describes Martinez' assistance as "significant and useful," and the United States asserts that the "truthfulness, completeness, and reliability" of Martinez' testimony "were corroborated by law enforcement authorities."  United States' Motion ¶¶ 2-3, at 1.  The United States further notes that Martinez provided testimony against Defendants Billy Garcia, Patterson, Chavez, Joe Lawrence Gallegos, Andrew Gallegos, Arturo Garcia, and Troup, and that Martinez has also helped with a separate investigation of a recent murder and stabbing.  See United States' Motion ¶ 3, at 1-2.  The United States stresses that Martinez' cooperation has endangered him and his family, as the SNM is likely targeting him for his cooperation.  See United States' Motion ¶ 6, at 2.  The United States

thus requests that the Court depart downward by 20 levels from the applicable Guidelines range if the Court concludes that Martinez is in the criminal history category VI. See United States' Motion at 2. Alternatively, if the Court concludes that Martinez is in the criminal history category V, the United States requests that the Court depart downward by 19 levels from the applicable Guidelines range. See United States' Motion at 2-3. Because Martinez' offense level is 43, both of the above scenarios would result in an advisory sentencing range of 92 to 115 months imprisonment, and the United States specifically recommends a 96-month sentence. See United States' Motion at 2-3.

Martinez supports the United States' Motion, and "requests that the Court depart further than recommended by the Government." Sealed *Ex Parte* Memorandum in Response to Government's Motion for Downward Departure (2915) at 1, filed October 11, 2019 (Doc. 2918)("Departure Response"). Martinez identifies three reasons why the Court should give a sentence lower than 96 months: (i) "96 months does not fully reflect Martinez' cooperation" with the prosecution; (ii) "the danger to Martinez and his family as a result of the cooperation" is high; and (iii) a greater downward departure would serve "the institutional incentives sought to be achieved by departure motions." Departure Response at 1. Martinez specifically requests a departure to offense level of 17, and a sentencing in accordance with criminal history category of V or VI, for a sentence of four to five years. See Departure Response at 1. He also requests a placement at a "local facility" so that he can continue assisting the State of New Mexico with an ongoing investigation and prosecution. Departure Response at 1.

Martinez states several additional facts in support of his request for a downward departure greater than the United States' recommended departure. See Departure Response at 2-11. First, Martinez maintains that he "has cooperated fully" with the United States and is currently cooperating with the State of New Mexico in a separate case. Departure Response at 2. Second,

Martinez asserts that there is "no mandatory minimum" sentence, and that a sentence is capped by twenty years when the United States files a motion under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. Departure Response at 2 (citing Plea Agreement ¶ 11.c, at 5; Fed. R. Crim. P. 11(c)(1)(C)). Moreover, Martinez contends that the Court "is not bound by the Government's recommendation in granting a substantial assistance motion." Departure Response at 3 (citing United States v. Krejcarek, 453 F.3d 1290, 1301 (10th Cir. 2006)). Next, Martinez describes in detail the ways in which he has assisted the State of New Mexico in a separate case, see Departure Response at 3, and he argues that his "ongoing cooperation sets him apart from other defendants whose cooperation was only in the SNM case," Departure Response at 4. In addition, Martinez argues that a 96-month sentence "does not go far enough to reflect the overall effect of Martinez' cooperation," and that his and other witnesses' testimonies have greatly disrupted the SNM's operations. Departure Response at 6.

Martinez also asserts that the fact that he left the SNM after his release from prison in 2006 warrants a greater departure, because "it contributed to Martinez' usefulness and credibility as a witness." Departure Response at 6. Furthermore, Martinez posits that his testimony helped the prosecution establish that an enterprise existed. See Departure Response at 7. Martinez emphasizes that the danger to which his testimony exposed him and his family is especially acute, because "there have been specific threats [in this case] and at least one homicide." Departure Response at 8. In particular, Martinez notes that Chavez contacted his wife from a jail telephone in May, 2017, to ask about Martinez' whereabouts, which made Martinez' wife feel "threatened." Departure Response at 10. According to Martinez, when he is out of prison, he will be able to relocate with his family, hide, and defend himself from future attacks. See Departure Response at 11. Last, Martinez argues that there are "'significant institutional incentives'" for giving him a

lighter sentence, because doing so "'will make other[] [defendants] more likely to [cooperate] in the future.'" Departure Response at 11 (quoting <u>United States v. Kuntz</u>, 908 F.2d 655, 657 (10th Cir. 1990)). According to Martinez, "[i]f the ongoing law enforcement efforts to prosecute gangs [are] going to be successful, potential cooperators need to know that prosecutors and the courts are going to acknowledge the substantial safety concerns not present in other cases[] by granting [greater] departures." Departure Response at 11.

The Court has carefully considered all relevant information in this matter. The Court concludes that, in the interest of justice, it should grant the United States' motion for a downward departure for substantial assistance to authorities pursuant to U.S.S.G. § 5K1.1. The United States requests that, if the Court concludes that Martinez is in the criminal history category V, the Court depart downward by 19 levels from the applicable Guidelines range. <u>See</u> United States' Motion at 2-3. Moreover, the United States specifically recommends a 96-month sentence. <u>See</u> United States' Motion at 2-3. Accordingly, the Court will grant a downward departure of 19 offense levels from an offense level of 43. An offense level of 24 and a Criminal History Category of V result in a Guideline imprisonment range of 92 to 115 months.

The Court will not, on its own, grant a larger departure. In a multi-defendant case like this one, the Court has to rely heavily on the United States' valuation of the defendant's assistance. The Court acknowledges that it has the raw judicial power to grant a greater departure than the United States requests, but to do so in this case could upset the delicate balance that the Court must maintain with so many cooperating Defendants. The Court declines to exercise the power it has and agrees with the valuation that the United States assigns Martinez' substantial assistance.

**IT IS ORDERED** that: (i) the Defendant's Objections to PSR, filed September 23, 2019 (Doc. 2891), is overruled in part and sustained in part; (ii) the Objection to the U.S.S.G. § 3A1.3

adjustment is overruled; (iii) the Objection to the U.S.S.G. § 3A1.1(b)(1) adjustment is overruled;

(iv) the Objection to sentencing in accordance with criminal history category VI is sustained; and

(v) Defendant Eugene Martinez' total offense level is 24 and criminal history category is V.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

--and--

Susan M. Porter
Albuquerque, New Mexico

     *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

*Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

*Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

*Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

*Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

*Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

*Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

*Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

*Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

      *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

      *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias Attorney at Law
Albuquerque, New Mexico

      *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

      *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Richard Jewkes
El Paso, Texas

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Brusuelas-Benavidez
Albuquerque, New Mexico

    *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

      *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

--and--

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

      *Attorneys for Defendant Carlos Herrera*
Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

     *Attorney for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

     *Attorney for Defendant Shauna Gutierrez*

Alfred D. Creecy
Albuquerque, New Mexico

--and--

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Brandy Rodriguez*